Good morning. Welcome to the Court of Appeals for the Sixth Circuit. Judge Sir Heinrich and I are very pleased to have sitting with us today Judge William Stafford from the Northern District of Florida. Judge Stafford, thank you so much for joining us and helping us with our docket. Honored to be with you again, sir. Before we begin, I do want to assure you that we are prepared for the cases this morning. We have read your briefs. We therefore would prefer it if you please spend the time arguing the most critical issues in the case. We will assume that the matters that are not argued today that you rely on those matters contained in your briefs. Finally, if your counsel for appellant and wish to reserve some time for rebuttal, please so indicate to me and also to our court officer. With that, you may call the first case. Good morning. Good morning, Your Honors. Marcel Benavides on behalf of the appellant plaintiff Zulema Bonner Turner, I along with Mr. Nicholas Backos represent the appellant. Judge, I would like to reserve five minutes in rebuttal if I may. Very well. Thank you. Your Honor, on behalf of the plaintiff appellant, I'm asking this honorable court to reverse the lower court's dismissal of plaintiff section 1983 excessive force claims, supervised reliability claims, deliberate indifference to a serious medical claim and Monell claim. Judge, first and foremost, I'd like to just address the court as we move through the case. I want to briefly touch on the excessive force. These claims were staged by Judge Zadkoff in the lower district court. The plaintiff appellant submitted a video to Your Honors that exhibited the conduct by the officers, the defendant officers at the E-course jail or police station jail. There's ample evidence to show that there was a use of excessive force in the processing room. The deceased, Mr. Alfonso Turner, in the processing room was standing there handcuffed at some point. He was searched. Money was taken. Sergeant McKaig, defendant McKaig, then pushes Mr. Turner's face into the wall, starts yelling at him while he's handcuffed using excessive force. What did he spit on? I don't think he spit. He was talking. And the video actually bolsters our claim that when he was talking to him, you could see spit coming out of his mouth at some point when he's speaking. I don't think it was any type of assaultive conduct. And I think the video clearly shows that he was talking to him while McKaig is... Is this your best argument? No. About this case? Judge, I'm just expressing my claims as far as excessive force. I just wanted to bring that up. That's kind of a minor claim. I would think, though, when you've got 10 minutes, you'd want to get to your best argument. Our best argument, Judge, is the dismissal of the deliberate indifference claim. I guess just before you move on, I've seen both videos. And the hallway video is kind of a lesser, less serious push or whatever. I mean, your position is that the processing room push into the wall is a little more egregious than the hallway one? That, along with him dragging him by his hair out of the processing room, yes, while he's handcuffed. Okay. I mean, but you've got a wrongful death claim here that I think exceeds being pushed against a wall or even that troubled breathing claim. I don't know how that really exceeds a death and how that really... I mean, you have a death. It seems like that would be the main claim. That is the main claim, Judge, and I'll address that now. The lower court erroneously ruled that plaintiff's denial of medical care must be taken under the 14th Amendment's very stringent standard instead of the 4th Amendment standard. We addressed in our brief that this court can use the 4th Amendment standard. Does it make any difference in this case whether we use the 4th Amendment or the 14th Amendment? Or in your opinion, would the result be the same? I think the result would be the same, but I think the burden of proof is much lower in the 4th. Sure it is. But if you were to win on the deliberate indifference standard, which is the 14th Amendment, would we need to consider the 4th Amendment standard? No, but I think at this jurisdiction in Aldini as well as looking at... Our jurisdiction's unclear. I mean, we haven't ruled on it. It's a matter of first impression. To some degree. I think... No, it is, isn't it? Sure, it is in this case. But, I mean, normally we'll take a more conservative approach of not ruling on issues that are not necessary for the disposition of the case. So I guess my question is, if we agreed with you on the deliberate indifference standard, would it be necessary for us to rule on whether the 4th Amendment standard should supersede it? That's all. True. No, I mean, what's your answer to that? Well, my answer is, I think that there still needs to be clarification. The 4th Amendment still applies. I mean, we would surely overcome the motion for summary judgment if we used the 4th Amendment reasonableness standard. But you didn't use it. Did you use the 4th Amendment? Yes, we did in our complaint and our brief all the way through. I mean, but when you were arguing this motion or... There was no argument. When we briefed it out, we did. We specifically laid out an entire section explaining Eldini, explaining the Seventh Circuit cases of William v. Rodriguez, explaining Boone v. Spurgess in this circuit, explaining Alexander v. St. Bill Company, which used the reasonableness standard in the deliberate indifference case. You can go all the way back to Graham v. Connor, where there was a case of somebody who had a diabetic coma, some sort of diabetic issues, where they said deliberate indifference should be looked at under the 4th Amendment. My notes say it was not until the plaintiff filed a motion for reconsideration that you argued the 14th Amendment. We argued it in our reply brief to the summary judgment. Not in your... Just in your reply brief. We argued it in the motion reconsideration and as well. But you focused your... Most of your argument was on the 14th Amendment. You took a little swipe at it. You put it in your complaint, took a little swipe at it during your pleadings, but your whole focus was on the 14th Amendment. Counsel? I respectfully, Your Honor, disagree. We did a whole categorical argument on that, asking that this circuit find that the reasonableness standard should be used. The motion for summary judgment was based on the 14th Amendment, was it not? Or was it based on both? I believe you based it on a categorical all. Okay. I thought the motion mainly argued the 14th Amendment standard, so you responded to what they were moving. We did respond, but we also asked them to consider our argument under the 4th Amendment. We said, if you're going to rule in their favor for deliberate indifference, use the 4th Amendment. If you don't use the 4th Amendment, here's our arguments under the 14th more stringent standard. Okay. If we were to go there, tell me why, as a matter of policy, we should apply the 4th Amendment to somebody who is in custody. Sure. The crux of the argument for the 4th Amendment reasonable standard to apply is the fact of what is the status of the individual who is... Status is he's in custody. He is in custody. He is in custody and he is in jail, but he has yet to be arraigned. He has yet to go before a magistrate. Why should that make a difference? Because the case law says that once you get before a judge, and once you get before a judge who's going to take away some of your rights, whether it be for the arraignment, whether it be take away your rights for bonds, you're restricted, take away your freedom because you're going to stay in jail because you can't pay your bond or no bond, that your status then changes from somebody who went... You're restricted anyway because you're lawfully in jail waiting for your probable cause hearing. Correct. So, I mean, it's not like you're That's right. And even if you had a probable cause hearing, they could appeal... You could appeal the probable cause termination in Michigan. And what if it was found that you were... The probable cause termination was erroneous? I mean, this thing about having a hearing is dispositive. I don't know because a hearing may or may not be correct. Well, I think some of the arguments that some of the judges have made is that once you have this timing mechanism in Michigan to get before a magistrate within hours of your arrest because it was a warrantless arrest. This was a warrantless arrest. That's legal in Michigan. It is legal in Michigan. But I think the point is that some people are illegally arrested and so the point is... Most of them are not. True. So we're going to treat them as if they're illegally arrested? I think we ought to treat them the opposite. Treat them as if they are legally arrested unless they establish the contrary. And therefore, you would treat them as if they had a probable cause hearing or if there had been a grand jury indictment. It seems to me like the presumption ought to be the other way rather than the presumption that illegally they ought to presume that they're legal absent you showing us to the contrary. I think the reality, though, is that to get the finding that somebody should be held in custody, that the officer did do a legal arrest... You're missing, I think... I happen to agree with what was just said by my brother jurors here, but you're missing the point. What requires us then to go to the Fourth Amendment assuming somebody is legally in jail? I mean, is there something that you've got some policy other than just saying, well, one's been arraigned and one hasn't. Therefore, one is guided by the Fourth Amendment, one is guided by the Fourteenth. That doesn't seem to be anything. Respectfully, Your Honor, I think the issue is his status. It really comes down to his status. And in Lanier, U.S. v. Lanier, the court says that. If there's somebody who is... If there's a more applicable amendment that applies, how is it any different if somebody is beaten in the jail sitting and booking? You still use the Fourth Amendment reasonable standard there. Just because the tort is different doesn't mean that you get to use... Fall back in the rubric of the Fourteenth Amendment. If I may, I only have a minute here, Judge, I would like to address the deliberate indifference claims. I would also state that the court erroneously ruled, if you look at it in the Fourteenth Amendment circumstances, that there was ample facts that Mr. Turner was suicidal. There were so many facts. He was at the scene that... First off, the ambulance was... Or the 911 call was for an ambulance. Send me an ambulance. Send me an EMS. My husband's having a fit. He has a gun. Frierson notifies the fire department as an attempt suicide. The EMS fireman... My time is up. So who violated his Fourth Amendment? Every single officer that had contact. Frierson, McCaig, Graham, and Marks. Every single one of them violated his rights via the deliberate indifference claim. I don't want to cut you off. Is Champagne still in the case? Gerald Champagne? Yes, he is. What's the liability against him? The liability against him, Judge, is that when we talk about Monel, the Monel issue is that he ratified this cool-down period. In our case, we suggested that this cool-down period that doesn't matter if you're suicidal, if you're diabetic, if you're having some type of mental health issues or physical health issues, that notwithstanding anything, he ratified the policy of putting somebody into the jail cell notwithstanding anything. You can go in there with your belt. You can go in there without your medicine. You can go in there with your shoes. You can go in there with your shoelaces. You can go into that where you, quote, cool down. And Champagne ratified and acknowledged... He's the director of public safety, right? Yes. The city sets the policy. He's an employee. He's got to carry it out. How does he ratify it? Because in his deposition testimony, he admitted that they used the cool-down period. It's a custom. It's not a... Okay, but it's not his decision? I mean, I'm trying to figure out the liability here. I mean, the city is liable under Monel for a policy, a custom, a practice, but the director of safety for carrying out that without more, I don't... I would respectfully state that Director Champagne, although no city is ever going to say, we have a cool-down period and you can put anybody you want into the cell. It's a custom. And because he accepted the custom, that happened routinely. Could he reject it? He could, but he said he didn't. He said it happens frequently. Alright. Isn't that Monel where they put this child in a bad home? I mean, couldn't you say the social worker accepted that? But the Supreme Court said no. Supreme Court says no. But we believe that the fact that he's the lawmaking, the ratifying person... It was the social worker involved in placing the child. True. I think she was more or less carrying out the policy. Director Champagne is creating the policy along with his... I assume this is a city, so there's a city commission. Correct. The city commissioner is the ones that set the policy, not the employees. Written policies, for sure. But this isn't a written policy. This is a custom. This is a practice. Oh, okay. Alright. We kind of spent a lot of your time talking about one issue. Do you want to wrap it up? Judge, I would just say that as far as the deliberate indifference claim, yeah, that is the crux of our case, and that is the main argument. I was trying to address standards and how we apply it, but the facts are the facts. We have a call to a home for help. We don't have a call for police. We have a call for help. And the call for help is based on, he's having a fit, is the term she uses, the caller, his wife. And the officers get there. Mr. Turner is clearly having suicidal ideations, because he's yelling, I'm suicidal. Take me to the hospital. Suicidal. Take me to the hospital. Doesn't he go back and forth? Take me to the hospital, take me to the jail? He says, take me to the jail to... Supposedly, that's what Officer Marks says. No one else confirms that, but I don't have any way to dispute that as of this point. But he says that after he's kicked, his stitches are split open in his finger by the fireman as he's working on him, that Marks basically says, I've had enough. I've had enough of your ranting and your raving, because Turner's standing up and down, spread eagle on the ground, completely mumble jumble, as the EMT technicians described his vocabulary. And as he's doing this bizarre behavior, Marks basically says, I've had enough. That's it. You're going to jail. You're going to jail. And then that's when Turner starts to have even more of a psychotic breakdown and starts to say, well, take me to jail. Take me to the hospital. Take me to jail. Take me to... Back and forth, back and forth, back and forth. His wife is yelling, he needs to go to the hospital. He is suicidal. Not that he's past suicidal, not that he's committed... Tried to commit suicide in the past. He is today. And he's saying, I am suicidal now. Take me to the hospital. What more could he ask for? What more could he do other than in the con case that we cited from California, the ninth district, where the person in the back of the vehicle puts the seatbelt around her neck and says, I'm going to commit suicide. Does it take that much? No, it shouldn't take that much. They were held liable, but reversed on different grounds. But in this particular case, all of your opinions, Judge Griffin and Sir Einrich, when we look at when is it applicable, we look at the time of the event. This isn't a case where it goes on and on in the jail, days later, days later. He asked for medical help at that moment when they were at the house, and he didn't get the medical help he needed. He specifically said, I need help. I'm suicidal. Everybody told the officers he's suicidal. In fact, his self injurious behavior all the way to the police station where he's banging his head in front of marks where he's tased while handcuffed, that claim still is alive. Is there a hospital readily close by? Two minutes away. Is there a hospital that could accommodate this problem? Are there any proofs in the record? Yes. Marks testified that Henry Ford Hospital, which I know is a high level trauma hospital, was within two minutes from his house. I'm not sure all emergency rooms have mental ill wings or facilities, but that does? I believe that hospital, I'm not 100% sure, but I know that under the statute in the law, I also cited, you can do involuntary commitments, and that's the only hospital that would, it's in the Wyandotte area, or I'm sorry, Eccles area, where this happened. It's a two minute drive, he said, from where the house was, and that's where people would be taken. I'm almost certain that Marks did say he's taken people to that hospital on prior occasions. I believe he did say that in his, I don't know if he said mental, I think he just said for going there, but I do believe they do. When I first read this, you know, we're incarcerating so many of the mentally ill because there's no place to put them, and because we've closed all our mental hospitals, Traverse City, Kalamazoo, and other places, and we're doing outpatient treatments, and we're not treating the mentally ill, and we're incarcerating them. And I looked at it, well, what are they supposed to do since we don't have really the facilities for the mentally ill that we should, but you're saying that Henry Ford would be able to treat... Henry Ford would have been able to treat him, and even if they say we can't treat him, he's at a hospital setting, they're going to find somewhere for him. They're going to transfer him somewhere that can deal with it. So they had every opportunity to do that. And I think that most obvious facts that are in this case, distinguishable from any case that defendant's appellees are going to cite, is the fact that Mr. Turner specifically asked for mental health help. Specifically. You can look at Denise, where they didn't ask for mental health help. You can look at all these other cases where time went on. They were in custody at the jail. Time went on. How about him not taking his medication? How many of the defendants knew that? They all did. Mrs. Turner told everybody. In fact, Graham said to Mr. Turner, what are you? What's going on? I didn't take my meds. I'm bipolar. I'm schizophrenic, and I haven't taken my meds. Mrs. Turner tells him, he just got out of the mental institution a couple days ago. He's really upset. My mother just died the day before. He's thinking about suicide. My mother just died. He's thinking about suicide because his son was murdered a few years ago. All of these emotions were coming about. He had just been released from a hospital four or five days prior for mental health issues. They were trying to regulate his medications. In fact, Graham says to him, Mr. Turner, I will get you help. I will get you help. And she admits on the record that because of his behavior and because of his mental state, that he needed to go to the hospital. Counsel, let me ask. Yes. Is it your position that at the Turner's house, the decision to take him to the jail, that's when the first violation occurred? That they should not have taken him to the jail at all? Yes. Oh, okay. Immediately. That's when the right was broken. So that triggered it right there. Right there. All right. Any further questions? You'll have your five minutes. Thank you, Your Honor. Good morning. Good morning, Your Honors. Jamie Janish on behalf of defendants at police. I think it's important to note at the beginning that this case is involving a defendant's motion on summary for summary judgment regarding their entitlement to qualified immunity. The four officers, the main focus is the excessive force and the deliberate indifference to his, to Mr. Turner's medical needs. Qualified immunity, the officers are entitled to qualified immunity unless the evidence viewed in a light favorable to plaintiff establishes that the officers violated a constitutional right and that the constitutional right was clearly established at that time. In our brief, we've set forth all of the facts that are available and then plaintiff's reply. She's taken the facts and rather than view them in a light in her favor, she's essentially eliminated any that are unfavorable to plaintiff. For example, with respect to the excessive force claim, the undisputed evidence is the video recordings and Mr. McCaig's testimony and Mr. Mark's testimony regarding their actions with Mr. Turner while in the jail. Based on that evidence, the actions by Mr. McCaig with respect to treating Mr. Turner while in the booking room and... You know, you two are fixated on that part. Seems to me the biggest problem you may have or maybe the biggest to me is when they were called because he had supposedly a mental problem and needed to go to jail or to a hospital, they get there, the wife indicates that he's off his medications, that he just got released from a mental institution, that he is suicidal and on and on and on. They turn that and you've got the EMS right there to take him to the hospital. The fact that they escalated the and didn't get him to a hospital, even when they subdued him, instead they took him to jail, that seems to me to be a bigger problem for you than what happened in the jail. Well, I agree that with the facts that at Mr. Turner's house during the time of the arrest or prior to the arrest that plaintiff has testified she was telling the officers Mr. Turner himself was saying he was suicidal and indeed the firemen who were all licensed EMTs were the first to arrive on the scene. And they obviously were called, they were the EMS. Correct. And when they approached Mr. Turner, he would not allow them to take his vitals to provide any medical care. And in fact, one of the police or one of the firemen, when Mr. Turner was on the which led to Mr. Turner jumping up, getting in the face of the firemen, which involved, which required then the police officers to take over the situation. I understand them having to maybe subdue him, but the whole essence is this guy's crazy. And he's off his meds and he's crazy. Now, why didn't they just subdue him and either they take him or put him in the EMS and strip him down and EMS take him to a hospital, not to a jail. That's what I, that's where I'm having problem with your defense counsel. Well, the city of Ecorse through the fire department was attempting to provide medical care through the EMTs. I understand that. And he acted up, but he was off his medications. Now they subdued him. They got him at least subdued enough. They could get him in a squad car. Why didn't they take him to the hospital? Well, because there's no, if he's not accepting medical assistance at the time they show up and there's nothing. So, so the blame is on this guy that's off his medications. That's suicidal. That's having fits. The blame is on him for not making the right decision. That's your argument. My argument is that explains the officer's conduct as far as... It does. I mean, they take the defendant's word at that. What if he just said, well, I'd like to just now go home. I'm relaxed now. Put me home. That would be their, they would be guided by what he said. If there was no criminal conduct and he wanted to go home, I don't see how the police would then have to intervene, seize him and do something against his wishes. I don't understand your argument really, counsel, that he was still acting up, but that's the problem. Isn't that why the EMS and them were called because he was having these problems? Well, he was called, they were called because he was acting crazy. Mrs. Turner wanted him out of, she was yelling from the porch to get him out of there. Do we allow crazy people to make decisions? That's called mental incompetency, isn't it? Mental incompetency? Yeah. And I would say they're... You say, well, he didn't treat it because he didn't want to be treated. Well, he's mentally, appears to be mentally incompetent at the time. And even if he tried to make decisions, he's not competent to do it. Right, but I think based on the facts that the officers had, they weren't necessarily delegating the decision of where he goes, but the fact he was not accepting any medical treatment, that it's reasonable for them to then arrest him, take him to jail. Well, anyway, that's a pretty weak argument. I guess, as my brother says, what's your next defense? Well, I mean, that's the basis. You have to consider all the facts that when they arrive at Mr. Turner's house... Okay, well, under deliberate indifference, there's an objective standard and a subjective standard. Do you concede that the objective standard is realized, and do you concede the subjective standard is realized, or what? No, I mean, under deliberate indifference, there has to be a strong likelihood that Mr. Turner's gonna attempt suicide. And based on all of the facts, not just him saying, I'm suicidal... That's the objective standpoint, so you're contesting that? Contesting that, and that also plays into the subjective component, which is that each of these officers, the four officers, all perceived facts that would lead to the strong likelihood, inference of a strong likelihood that Mr. Turner was going to commit suicide. That they didn't have that knowledge? I mean, what facts didn't they have? If you say they subjectively did not know, what didn't they know? Because it seems like they were told everything. Well, it depends. There's two officers, Marks and Graham, who are at the scene. Okay, let's deal with them first of all. I mean, don't they know all the facts? They know that he's saying he's suicidal, which is him saying... His wife is saying that he's suicidal. He's off the meds. He hasn't taken his medication, Officer Graham. He says that to Officer Graham. They know he has a past diagnosis of being schizophrenic. I don't know that they know that. She's testified that. He was recently released from a mental hospital. Right. With respect to schizophrenic, I think that's in the fire department, in their report, has his history. I'm not sure if that was shared with the officers at the time. I don't know where they got it, except... But in addition to that, you also have his conduct, where he's refusing medical help. Officer Marks asks him, do you want to go to the hospital? Do you want to go to jail? He swears at Mr. Marks. What was his disorderly conduct? Pardon me? What was his disorderly conduct? Well, I think the fact... I haven't reviewed the ECOR statute, but the fact that he was swearing in public, awakening his neighbors. He had gotten into the face of one of the firemen who was trying to provide him assistance. There's... Disorderly conduct? There's testimony that he was loud out in the street, awakening neighbors. That's disorderly conduct? I believe so, yeah. So ECOR arrests everybody that's loud in ECOR? That wakes up people? I don't think they... I mean, I don't think they have the police force to deal with all of those incidents, but in this instance, they were... I just... Interesting. I thought that that's their defense. Right, but... So you have the conduct at the house, which is, indeed, you do have him saying he's suicidal, but you also have other facts that don't show that he's suicidal, that he's making a choice to get up and get in the face of a fireman. He's saying, swearing at the police officers and saying, take me to jail. And indeed, once he does get to jail, there's no evidence he ever asked for medical assistance related to... You put all the emphasis on the crazy person. I mean, your whole defense every time you get cornered a little bit here is, he didn't tell us what to do. Right, but... And the basis for that is that those officers are making their decision... He didn't tell us. Based on what they're observing. And if they're not making a decision, is he telling us because he has some mental deficiency, mental disturbance, or is he telling us because he's... This is what he wants. So they're not making that judgment, they're... I mean, they don't have the ability to determine whether this is the result of mental disability or whether it's something else. Counsel, did you handle the case in the district court? I did not, no. Our firm did, but I did not. Are you familiar enough with the record? How did the case proceed in the district court? As a 14th Amendment claim, basically? Right, and... Was that the plaintiff's position? It was pleaded, I think, in their complaint as if the deliberate indifference was 14th and under the Fourth Amendment. In their response motion to our motion for summary judgment, they raised it in a footnote, said the court is permitted to address deliberate indifference under the Fourth Amendment, but there's no argument regarding whether the Fourth Amendment should apply, why it should apply. And I don't think the Fourth Amendment... They wouldn't be arguing deliberate indifference under the Fourth Amendment. I understand. They would be arguing objectively unreasonable. I agree with that, but the way they put it in their motion was that the deliberate indifference... They didn't have a motion, they mean in their response. In their response to our motion. So the district judge was basically dealing with a 14th Amendment claim, was he not? Right. Okay. And so then moving through, you also have Frierson and Officer McKay, who again, their involvement with Mr. Turner is at the jail where he's asking for medical assistance, but it's related to his hand and it's related to his inability... Counsel, would you concede that if we looked at this from an objective unreasonable standard under the Fourth Amendment, that there's enough facts to make that an issue of fact for the jury? No, I mean, I think it's still objectively reasonable what these officers did, that there was no... Objectively reasonable, you still have to look at what the risk is here. It's usually reasonable, and I'll sketch it in the jury, but I know deliberate adds another aspect to it, but you don't think that's enough to make a question of fact to the jury? No, because I think, I mean, you have the same indisputable facts and you have the same... The same indisputable facts as you would have for the 14th Amendment. Is that what you mean? Right. Well, they're two different standards, so... I understand. And the position would be objectively reasonable, so taking these facts, they're taking him to the jail as an objectively reasonable response to him... For him being off his meds, being acting crazy, being just released from the hospital, telling them he's suicidal, his wife telling him he's suicidal, that's a response. Right, and where he's... A reasonable response. I believe it is a reasonable response, he's not taking any other action as far as complaining about being suicidal once he gets to the jail. They get him to the jail... That's after the fact, let's keep it at least in the initial stages of it, where they could have put him... Where they show up at the house. Where they at least subdued him to get him in a squad car. The question is, with knowing everything they know, is it unreasonable to say they should have taken him to a hospital? I believe so. I mean, they were able to get him under control at the scene, but as evidenced by his kicking the car on the way to the jail, to show up at a hospital with somebody who's admittedly intoxicated and having his wife call and having a fit, to then show up at a hospital, I don't think that's reasonable by the police. More reasonable conduct is to take him to the jail, book him in a cell that can be monitored. Hold him there until what? His mental condition improves? Till he calmed down. Well, maybe he won't, though, if he's off his medication. I mean, would you hold him there forever? No, I don't think they're going to, but to the extent... But the man is psychotic. The man is off his medications, and you're going to put him in a jail till he cools down or calms down, and that's a reasonable act? He's also intoxicated at the time, and the officers do not have the ability to determine, is him acting crazy the result of his craziness? If they don't have that ability, take him to somebody that does have that ability. Right, and I think my position would be that the officers are not going to take an unruly individual who's intoxicated, who, I mean, he's not so intoxicated, he doesn't know what's going on. He's obviously able to respond to their questions about going to jail or the hospital, that to take him to the hospital when he's in that condition is not reasonable. So the officers, did they testify they thought he was drunk as opposed to being crazy because he's off his medication? Yeah, I mean, they said... I know McKay testified, or who was in the jail that... At least some of them testified he was intoxicated, and I think that was part of the evidence was that he had been drinking all day, and... I mean, if somebody needs to be on meds to be acting rationally, I mean, getting back to Judge Sir Heinrich's point, I don't know how putting him in a holding cell without access to the meds that are necessary for him to become rational would restore him to his health. I mean, if you need meds and they don't have meds, they're not trying to get him meds, I don't know how they think he's going to come around. Right, but then you're putting the duty on the officers to make basically a medical... They can't be deliberately indifferent to the prisoner, the detainee's medical needs. I mean, that's clearly established law. Right, and I don't think they were. Again, I would go back to... They know he needs meds to act rationally, and he has no access to his meds. They're not trying to get him his meds. Isn't that deliberately indifferent to his legitimate medical need to those meds? No, because, I mean, him acting crazy is not indicative of his strong likelihood that he's going to commit suicide. All right, a lesser point of the case is the excessive force claim  is that even though Mr. Turner was yelling at the officer, probably spitting on him, the officer with his hand pushed him on his back and pushed or slammed him into the wall. And how is that not excessive force? Well, the district court found that the video didn't show that his face had pushed into the wall. Well, I think he said he wasn't really seriously hurt by the push. I mean, I guess I can quote it. That he didn't stumble or... The court finds, as a matter of law, there was no use of excessive force by McCain. At worst, McCain pushed Turner, but not with such force as to cause Turner to do more than graze the wall and the corner in the extreme close proximity of where Turner was standing. So Judge Zankoff was basically saying, yeah, he pushed him against the wall, but because it was only a graze, there's no claim, I guess. Is that the law of excessive force? That a grazing, the officers can do it okay if it's just a grazing as opposed to a total smash in your nose or something? I think it's showing the extent of the force where he was pushing him. Well, why do you need force at all? I mean, the guy's spitting on the officer, but that doesn't give him right to assault him, does it? Well, he's trying to maintain control of the situation. He's trying to maintain... By slamming him against the wall? Well, as the officer is leaving the room, he's pushing him to keep him away. So as he exits... You say it's for his own safety then? Well, it's for his own safety and for preventing him from spitting on him. If he's being combative and during the time he's addressing him, he's keeping his back so the officer can check his pockets and maintain control by having him... He's on his back already, he's got his hand there, and then he shoves him. Because as he's leaving the room, obviously if he doesn't hold him there, he's going to turn. He doesn't shove him, then he might assault him. Okay, that's the argument. That's not quite what Judge Zankoff did. Zankoff said, well, because it was only a grazing blow to the wall, I don't think that's excessive. I guess it just wasn't the force enough. Right, that's describing the extent of the force. It wasn't... He's got to say that it was gratuitous force. And usually this excessive force cases, if the officers do it gratuitously, they don't do it for self-defense purposes. They don't do it for other reasons. They just do it to injure this person. It doesn't matter how severely the guy is injured if the officers had no basis to assault him. Right, and I think there is a legitimate purpose in that McCaig testified. Okay, you're out of... Anything else to wrap up here? No. Any further questions? Thank you. All right, thank you, counsel. All right, five minutes rebuttal. Thank you. Sometimes good argument is no argument, counsel. I'm sorry, Judge, I couldn't hear you. I said sometimes good argument is no argument. True. I just want to say one thing in that case. I just want to direct the court's attention to a case that came out in 2015. It's with Judge... Before Judge Boggs and Judge Griffin and Judge Hood. It's a Kenneth Mantell v. Portage County. And the only thing I want to cite about that case is the fact that it's a deliberate indifference case. And the court cites two cases out of the eighth... Or one case out of the Eighth Circuit, Coleman v. Parkman and the Seventh Circuit, Cavalieri v. Sheppard. And in those cases, the court said... This court said that because the deceased who committed suicide in custody was calm and reported to a nurse that he wasn't suicidal and didn't ask for medical attention and didn't have any unusual or erratic behavior that the officers wouldn't know, fitting the subjective component. And the court said, well, look at other cases. Look at the Coleman v. Parkman and the Cavalieri case. That case is using deliberate indifference, so that would be... Yes. So 14th Amendment would be our standard? Yes. And in this particular case, they used the 14th Amendment. But since you're citing it to us as being authority for this case, then you would want us to judge this in the 14th Amendment. If you're going to use the 14th Amendment, this would be the case that would address that as well. What's the site of that case? It's why I say some good times are... There's no argument. What's the site of that decision? Sure. It's 2015 U.S. App Lexus 7983, 2015 Fed App 0335N. The only reason why I'm bringing this to the court's attention is if you do use that standard, I think the Fourth Amendment should be applied. Objective reasonableness. You're citing it as authority as a 14th Amendment. The reason why this may not be judged a Fourth Amendment case is because no one may have ever asked to use this standard under the Fourth Amendment. When we looked... When Mr. Bakos and I did all of our research and we were like, what case... You don't have to go through that. If you've got a legal matter you want to really attach to here, address yourself to that. Thank you. The only thing that I'm saying is that I don't know if it was ever pled appropriately. I don't know if the complaint in this case pled the Fourth Amendment standard. I did in my complaint. I addressed it with Judge Zadkoff. I did it in a motion to reconsider it with Judge Zadkoff. They should have used the Fourth Amendment. They said you just cited the Fourth Amendment in a footnote. I did. I said, if you're going to use... I go, we can use the Fourth Amendment reasonableness via the Illinois cases that I cited. These are cases. We have Denise. And in my motion to reconsider, I went all over that. But counsel, you know darn well you proceeded with this case as a Fourteenth Amendment claim, did you not? I did both, your honor. Yeah. Come on. What was the thrust of your argument? Both. Okay. I mean, if the thrust was the Fourth Amendment as well, why did you relegate it to a footnote? I mean, footnotes by itself are usually... True. ...not that important, not essential to your position. And I always say a footnoted opinion is, by definition, dicta to the opinion. And it can be disregarded. So, I mean, you expect us to read all footnotes and briefs. True, Judge. I understand that. It was a limitation on pages. We did address it. We said, assuming arguendo, you're not going to use the Fourth Amendment. Here's the same arguments that you would use for the Fourteenth. Therefore, the Fourth would be met as well. Counsel, were the meds available to him at his home? Now, you did handle the case in district court. Yes. I don't know for sure. Okay. So, if the meds were available to him at his home and he did take them, how do you fault the police for not giving them to him at the jail, if they would have had him? I don't think it's a matter of giving him his meds. His meds aren't going to instantly make him not suicidal. It was weeks. He was going through days of medication. And drinking. And drinking. Let me ask you, the police got to the house because his wife called him. Is that right? I mean, this wasn't something that happened on the street and the officer happened to be driving by or walking by. Correct. They got called to handle this, all right? Yes. His wife said that he was in the home saying, I want to die right now. I want to go to heaven and be with your mother and my son who was murdered. I think I understand that. Let me ask you, what would have been your claim had the officer said, we're just going to walk away. This is your problem. The EMTs and the police just left and said, his meds are here. He's not taking them. He's drinking. You handle it, Mr. Turner. Once they're called and they know and they have actual knowledge of his suicidal tendencies, the likelihood of that, they have to do something. They have to. Because he asked for medical help. If he didn't ask for medical help, such as the, I'm sorry. On the right hand, take me to the hospital. On the left hand, take me to jail, right? I think what happened though with the take me to jail situation is he has the taser exposed to him. He starts to be, a custodial situation has to happen. And Marks then says, you're going to jail. That's it. So the fireman said, the fireman told Marks, this is an attempt suicide. He should go to the hospital. Marks overtook that. Marks did what's called an override and did it on his own. The fireman said, Mrs. Turner says, the fireman said that he said, this is a classic case of attempt suicide. He needs to go to the hospital. Fireman said that. And they didn't take him. Respectfully, your honors, I'm out of time. I respectfully request that you reverse the lower court's decision. And thank you for the privilege to argue this case before you. You know, we have an attorney that helps expedite settlements. And frankly, between the two of you, I think this is a case that you might call that attorney and see if you can get this matter settled. Have you been to the mediation office? We have. We did it briefly. I have tried to settle this case numerous times. Well, now that we've heard oral argument and everything else, it might be a case that both of you ought to give some serious thought to. And so ordered, I'd be more than happy to do it, your honor. Well, I'm not. I'm just making a suggestion. Maybe I talk too much, too. Thank you very much. Thank you. All right.